## EVANS v. NARRAGANSETT INDUSTRIES CORP.

### Civ. A. No. 1041.

United States District Court
D. Rhode Island.
July 24, 1951.

Max Schwartz, of Providence, R. I., and Joseph W. Jennings, of Lynn, Mass., for the plaintiff.

Gerald W. Harrington and Herbert B. Barlow, both of Providence, R. I., for the defendant.

HARTIGAN, Circuit Judge.[1]

This is a civil action brought by the plaintiff, Harold A. Evans, of Massachusetts, individually and as sole assignee of Coreve Corporation, a Massachusetts Corporation, against the defendant, Narragansett Industries Corporation, a Delaware corporation, for breach of a license agreement entered into May 1, 1944.

Jurisdiction is based on diversity of citizenship and the matter in controversy exceeds the sum or value of $3,000, exclusive of interest and costs.

Plaintiff's claim is based substantially on paragraphs 2 and 10 of said license agreement.[2] The agreement among other things

---

[1]. Designated to hold District Court in District of Rhode Island.

[2]. "2. Evans does hereby agree to sell and the Licensee does hereby agree to purchase the machinery and apparatus and goods set forth in Schedule A attached hereto and the Licensee does hereby agree to pay the sum of Four Thousand Dollars ($4000) to Evans for said equipment.

\* \* \* \* \*

"10. Licensee agrees contingent upon being able to obtain materials essential in production to pay Licensors a minimum royalty of Two Thousand Dollars the first year, and Four Thousand—Dollars per annum for the second and succeeding years, and to make up any deficiency in the earned royalties above specified at the end of each such twelve months' period. It is understood that at the time of writing this agreement that certain materials which may be vital to the success of manufacture under this agreement may be unobtainable in sufficient quantities, due to government control or restriction, to enable Licensee to manufacture under this agreement in a volume sufficient to earn the minimum royalties herein provided. For the purpose of this agreement it shall be considered that materials are obtainable only if Licensee may purchase in the open market materials in quantities sufficient to produce an adhesive straight fabric in a volume sufficient to earn the minimum royalty at the above specified 2% rate. Provided that essential materials for production are obtainable by Licensee, the date upon which said per annum minimum rate shall start to apply will be the first of the month subsequent to time that the said Evans shall have completed the setting up of the

provides for the payment of certain sums of money, together with regular yearly royalties, until its termination. The complaint alleges due performance on the part of the plaintiff and that there is still due and owing to the plaintiff from the defendant the sum of $1,000 under paragraph 2 of the agreement and the sum of $18,000 in royalties under paragraph 10.

The defendant filed an answer and a counterclaim whereby it seeks to recover $39,093.69 because of plaintiff's alleged fraudulent representations.

The patents and apparatus covered by said license agreement contemplated the manufacture of adhesive fabrics and methods of manufacturing the same. Some of the chief characteristics of these adhesive fabrics, primarily for use in the surgical dressing field, were their elasticity and the manner in which the adhesive was applied to the fabric in narrow strips which would allow the "skin to breathe" when applied to the body.

The defendant's main contentions are (1) that the execution by Narragansett of the agreement was procured by the representations of Evans made both in behalf of himself and Coreve Corporation and that these representations were, in fact, not true, were known by Evans to be untrue, were made with the intention that they should be relied upon by Narragansett and were, in fact, relied on by Narragansett and hence Evans is liable to Narragansett for all damages caused directly by his misrepresentations; (2) that Evans has not sustained his burden of proof to show, as required by clause 10 of the agreement, that sufficient materials were available to earn the minimum royalties; (3) that the agreement was terminated as of June 30, 1946 by defendant's notice or certainly as of February 5, 1948, by plaintiff's notice and any sums which would otherwise have become due under paragraph 10 thereof for minimum royalties were terminated accordingly; (4) that the agreement was either void ab initio or voidable by reason of the side deal between Ashton, who was Narragansett's chief engineer, and Evans whereby Ashton was to receive a percentage of Evans' royalties for having aided Evans in the procurement of the agreement.

I find no merit in defendant's contention that Evans made fraudulent representations to the defendant. The credible evidence satisfies me that Evans had a commercially workable process although there were certain difficulties and "bugs" to be worked out before the project would be in volume production. Its development for volume production required the expenditure of a large sum of money and I am satisfied that Narragansett knew this. It was chiefly lack of capital which led to the abandonment of the manufacturing of this adhesive tape by two other concerns, Roche & Renaud Pharmaceutical Company and P. & R. Surgical Dressings, Inc. The latter produced over 5,000 rolls of adhesive tape and Evans received royalties thereon.

There are probably numerous reasons why Narragansett did not make a success of the venture. The evidence convinces me, however, that the main reason is that the adhesive project was "shelved", pushed aside and subordinated to other matters in which Narragansett was engaged such as the impregnation of army tenting material. This seriously hindered fruitful development of the adhesive tape project.

Evans told defendant that "it would take $100,000 to put it over." I believe this testimony in view of the previous experience of Evans with Roche and Renaud and P. & R. which concerns did not have adequate capital to finance the project.

Although there is a conflict in the testimony as to whether Evans told Narragansett of the necessity for steam or some kind of heat to dry the product, I am satisfied that Narragansett knew that drying by heat was required and that Evans did not misrepresent this matter to defendant

machine or apparatus suitable for commercial production. Should the supply of necessary material be unobtainable to Licensee at this time, then the said guaranteed minimum royalty per annum shall not start until the first of the month subsequent to the easing of restriction on the obtaining of materials for manufacture so as to make them obtainable in the quantity above specified."

nor did Evans make any material misrepresentation as to the rate of production.

The license agreement provided in part that Evans would set up the machines, apparatus, and licensed machine in the space provided therefor by the licensee so it would be capable of producing "satisfactory salable merchandise for the trade" and the licensee agreed to pay Evans $200 for such services. Evans did set up this machinery suitable for commercial production by October, 1944. This establishes the date upon which the minimum rate shall start under paragraph 10 of the agreement and I find this date to be November 1, 1944. Furthermore, the defendant did pay Evans the $200 and this goes far in refuting the defendant's contention that the process would not operate as represented.

[1] The plaintiff has shown by a fair preponderance of the evidence that sufficient materials were available to the defendant to earn the minimum royalties as set forth in paragraph 10 of the agreement.

Stuart B. Ashton testified that he saw the process working at Fairhaven, Mass. and that P. & R. turned out satisfactory surgical tape; that he interested Hempstead, who was vice president of Narragansett and had authority to act for it, and that he told him before the agreement was entered into of the arrangement he had with Evans whereby he was to get 10% of the royalties to be received by Evans; that he worked on a government contract for the defendant; that he was requested by Hempstead to stay away from the surgical tape project at defendant's plant; that he advised Hempstead of the need of an increase of machinery for production; that he told Hempstead that the first machine would produce 200 to 225 rolls a day and that a substantial amount of money would be required and that there was "too little financing at P. & R."; that in the spring of 1946 he was requested by Hempstead to show and explain the process to an Englishman and that he remained in the employ of the defendant until 1947 after having been employed by the defendant since 1944.

Hempstead testified that he knew nothing about Ashton getting a commission from Evans and that he first found out about it a year ago. Ashton's testimony impressed me more favorably than that of Hempstead in this regard and the so-called "side deal" does not affect the validity of the agreement.

Hempstead admitted that Evans told him that P. & R. did not have capital to keep the machine going; that Evans supplied him with sales and cost data of P. & R.; that Evans told him the machine would produce 12 to 15 yards per minute; that he saw a demonstration of the machine at Lynn and it "seemed to work reasonably well" and that after the Lynn conference the defendant was interested in the matter.

Hempstead testified that at the time the agreement was signed the defendant had no space available for manufacture and that it was not until the latter part of August, 1944 that a place was obtained and that Evans started to bring the equipment to it in October, 1944 and that the machinery was ready to run in February, 1945 and that actual operations to make surgical plaster began in September, 1945 and that Evans was on the defendant's payroll at the rate of $100 weekly from May to November, 1945; that on August 15, 1945 the army tent contract terminated and the defendant continued the surgical tape program; that containers, designs, etc. were prepared; that defendant hired Mr. Barlow to register the trade-name "Ventape"; that in September, 1945 defendant contacted a foreign buying commission and also United Surgical Co. of New York to be a national distributor.

Hempstead also testified that the cost of production was largely responsible for not continuing and that in the latter part of 1945 defendant decided that no progress could be made on the project.

Paragraph 15 of the license agreement provides in part as follows:

"15. This license hereby granted shall fully cease and determine

\* \* \* \* \* \*

"(b) At the option of the Licensee on June 30 or December 31 of any year after the license has been in effect for two years by at least thirty days notice in writing prior to such date of termination by Licensee to both of Licensors."

A letter dated March 26, 1946 from defendant's attorneys to Evans and Coreve stated in part as follows: "Licensee is satisfied that the facts as to the operation of the licensed machine are materially different than the facts represented to the Licensee concerning the licensed machine, which representations induced it to enter into this contract. Licensee, therefore, gives notice of termination of the entire contract dated May 1, 1944, and demands restitution of the moneys paid said Evans and Coreve as set forth in the contract and offers to return to Evans and Coreve all machinery and merchandise as scheduled in the contract upon the return of the moneys paid out because of the misrepresentation of a vital fact which induced it to enter into the said agreement."

██ The letter of March 26, 1946, supra, was sufficient notice and operated to terminate the agreement as of June 30, 1946.

By paragraph 15(b), supra, the license could be terminated by the licensee after the license had been in effect for two years. Since the two years were up on May 1, 1946, it is clear that the first date upon which the agreement could be terminated by the licensee was June 30, 1946. All that was required by the licensee was that it give at least thirty days notice in writing prior to such date of termination. I am satisfied that the notice, being more than thirty days prior to June 30, 1946 (in fact it was over 90 days notice), was sufficient to terminate as of June 30, 1946. The two year period refers to the minimum length of the agreement and does not convey to me a meaning that notice of termination could not be sent within the two year period. In short, the notice could have been sent any time after May 1, 1944, so long as it was at least thirty days before June 30, 1946.

The fact that the notice contained a demand for restitution does not make the notice ineffective. It merely indicated that the defendant was alleging a claim against the plaintiff and was merely surplusage as far as the notice of termination was concerned.

The words of the notice appear absolute and clearly indicate Narragansett's intention to terminate. The condition, if there is one, in the paragraph quoted from defendant's letter, supra, refers to the return of the machinery and merchandise. That "condition" can hardly be imported into that part of the paragraph referring to termination. It does not say that this notice of termination is conditional on Evans' making restitution.

Narragansett may have assigned a "wrong" reason for termination but no reason was necessary so long as timely notice was given and the intention to terminate was clear. See Goodwin Bros. v. Cook, 307 Ky. 646, 212 S.W.2d 126.

It would be inequitable and unconscionable in the circumstances here to hold this contract as subsisting until the filing of the complaint in October, 1949 or as subsisting until February 5, 1948, which was the date set by the plaintiff's notice of termination. All work had stopped on the project in early 1946. It was clearly a defunct project on June 30, 1946.

Paragraph 10 of the agreement provides in part: " * * * Provided that essential materials for production are obtainable by Licensee, the date upon which said per annum minimum rate shall start to apply will be the first of the month subsequent to time that the said Evans shall have completed the setting up of the machine or apparatus suitable for commercial production. * *"

Since I have found that essential materials for production were obtainable by the licensee and that the minimum rate should start to apply on November 1, 1944, I find that there is due and owing from the defendant to the plaintiff $4,666.67 under paragraph 10 and $1,000 under paragraph 2, or a total of $5,666.67.

The defendant's counterclaim is denied and dismissed.

Judgment, accordingly, will be entered for the plaintiff for $5,666.67, together with costs.

It is so ordered.